IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

KAREN BLACK,

       Plaintiff,

vs.                                CASE NO. 1:16-cv-360-WTH-GRJ

NANCY A. BERRYHILL,
Acting Commissioner of Social Security

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for disability insurance benefits ("SSDI") pursuant to Title II of

the Social Security Act. (ECF No. 1.) The Commissioner has answered

(ECF No. 10), and both parties have filed briefs outlining their respective

positions. (ECF Nos. 21–22.) For the reasons discussed below, it is

recommended that the Commissioner's decision should be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff filed her application for SSDI on September 4, 2012, alleging

a disability onset date of July 5, 2007. (R. 15, 295–96.)[1] Plaintiff alleged

several impairments, including chronic pain, depression, anxiety,

fibromyalgia, arthritis, sleep disorder with restless leg syndrome, migraines,

shoulder pain and impingement, decreased arm and hand strength, and

crushed discs in her neck. (R. 447.) Her application was denied initially and

upon reconsideration. (R. 112–52.) Following a hearing on January 13,

2015, and a second hearing on April 28, 2015, an administrative law judge

("ALJ") issued a decision unfavorable to Plaintiff. (R. 15–26.) The Appeals

Council denied Plaintiff's request for review. (R. 1–4.) Plaintiff then filed the

instant appeal December 1, 2016. (ECF No. 1.)

## II.  <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by

substantial evidence. *See* 42 U.S.C. § 405(g) (2012). Substantial evidence

is more than a scintilla, i.e., the evidence must do more than merely create

a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the

---

[1] Although Plaintiff's counsel stated at the hearing on January 13, 2015, that Plaintiff wanted to amend her onset date to September 4, 2011, (R. 38), nothing in the record evidences that Plaintiff agreed to this amended onset date, nor is there any other evidence that the onset date was formally amended. Nevertheless, Plaintiff does not raise the onset date as an issue in her memorandum before this Court and instead utilizes the July 5, 2007 onset date throughout her memorandum. Plaintiff has therefore abandoned any argument pertaining to the September 4, 2011 amended onset date.

conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider evidence detracting from evidence on which the Commissioner relied). However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the

Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1) (2012); 20 C.F.R. § 404.1505 (2015).[2] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. § 404.1520. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, she is not disabled. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.

---

[2] All further references to 20 C.F.R. will be to the 2015 version, unless otherwise specified.

§ 404.1520(c). Third, if a claimant's impairments meet or equal an

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is

disabled. § 404.1520(d). Fourth, if a claimant's impairments do not prevent

her from doing past relevant work, she is not disabled. §§ 404.1520(e)–(f).

Fifth, if a claimant's impairments (considering her residual functional

capacity ("RFC"), age, education, and past work) prevent her from doing

other work that exists in the national economy, then she is disabled. §

404.1520(g).

The burden of proof regarding the plaintiff's inability to perform past

relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996,

1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278

(11th Cir. 2001). The burden then temporarily shifts to the Commissioner to

demonstrate that "other work" which the claimant can perform currently

exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[3]

_____

[3] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the
> Commissioner. The Commissioner must produce evidence that
> there is other work available in significant numbers in the
> national economy that the claimant has the capacity to
> perform.  In order to be considered disabled, the claimant must
> then prove that he is unable to perform the jobs that the
> Commissioner lists. The temporary shifting of the burden to the
> Commissioner was initiated by the courts, and is not
> specifically provided for in the statutes or regulations.

## III.  SUMMARY OF THE RECORD

### A.  Medical Evidence

Plaintiff presented to the Orthopaedic Institute on April 19, 2007, for

a consultation with Kipp W. Kennedy, M.D., an orthopaedic surgeon. (R.

576–78.) Plaintiff reported a one-year history of pain that radiated into her

right arm and down to her hand, with numbness in her right hand. Her pain

varied significantly, depending on head positioning. Plaintiff also reported a

history of long-term dizziness, intermittent headaches, and fibromyalgia.

Physical examination revealed no outward abnormality in her cervical

spine. She did, however, have limited range of motion, particularly with

rotation, to the right and forward flexion maneuvers. Motor strength was 5/5

and equal in all motor groups in upper and lower extremities. Sensation

was decreased and paresthetic in nature in the thumb and index finger of

the right hand, normal in the other fingers, and normal throughout the left

upper extremity. Plaintiff demonstrated normal gait and no spasticity or

clonus.

A myelogram and post-myelogram CT scan performed on May 9,

2007, revealed broad based bulge at C5–6 causing mild spinal stenosis

_____

*Id.* (internal citations omitted).

with complete effacement of the anterior thecal space and flattening of the

cord, right-sided neural foraminal narrowing at C5–6 and bilateral neural

foraminal narrowing at C6–7. (R. 573–74.) There was, however, no nerve

root encroachment.

Plaintiff returned to see Dr. Kennedy on May 17, 2007. (R. 553.)

Based on the myelogram and post-myelogram CT scan, Dr. Kennedy

concluded that the focal posterolateral protrusion on the right at C5–6 was

the source of Plaintiff's symptoms. Dr. Kennedy advised Plaintiff that

surgical intervention had the best likelihood of significant improvement of

symptoms. Accordingly, Plaintiff underwent anterior cervical discectomy

and fusion ("ACDF") surgery on May 30, 2007. (R. 563–68.)

At her two-week surgery follow-up with Dr. Kennedy, Plaintiff

reported that her arm pain had been resolved. (R. 552.) She had no

complaints regarding her arm, and although she had some soreness in her

neck, the soreness was improving.

At her July 17, 2007 follow-up, Plaintiff was doing well and had no

arm symptoms or complaints of pain. (R. 551.) Likewise, at her September

13, 2007 follow-up, Plaintiff had no complaints and was pleased with the

outcome. (R. 550.)

At Plaintiff's December 13, 2007 follow-up, she reported having no arm symptoms. (R. 549.) She did note, however, intermittent discomfort in the neck, characterized as a catching and occasional popping with discomfort. Examination revealed good range of motion in the neck without limitation or discomfort, and normal motor and sensory function in both upper extremities. Although Dr. Kennedy discussed the possibility of physical therapy, Plaintiff reported that the symptoms were not overly problematic and instead only an occasional nuisance.

Plaintiff next treated with Chance Chiropractic Center from March 11, 2010, through August 16, 2010, for various pain, including fibromyalgia pain, hip pain, neck pain, migraines, left shoulder and left arm pain, and lower back pain. (R. 606–17.)

Plaintiff eventually presented to Alliance Family Physicians ("AFP") on August 31, 2011, to obtain medication refills. (R. 669.) Plaintiff weighed 364 pounds. Physical examination was normal. Bruce Branin, D.O., assessed Plaintiff with hypertension and depression. Dr. Branin also discussed a weight loss program with Plaintiff.

Plaintiff returned to AFP on December 13, 2011, after falling and hurting her right hip and knee. (R. 667.) Plaintiff walked with a walker and

examination revealed a guarded gait. All x-rays were negative. (R. 673.)

At her follow up with AFP on December 16, 2011, Plaintiff still complained of pain in her right hip and knee. (R. 666.) Examination revealed pain with flexion and extension of the right knee and swelling was present. Plaintiff nonetheless walked with a stable gait. Dr. Branin assessed Plaintiff with right knee sprain and strain, right knee pain, and effusion of the right knee. Dr. Branin gave Plaintiff a corticosteroid injection in her right knee. (R. 665.)

Plaintiff returned to AFP on December 23, 2011, with continued complaints of right knee and right hip pain. (R. 664.) Examination revealed a decreased range of motion in the right knee and pain on palpation of the right ischium. Dr. Branin prescribed prednisone and lortab.

Plaintiff next returned to AFP on July 18, 2012, with complaints of hip pain. (R. 663.) Plaintiff had pain with abduction of the right leg. Dr. Branin referred Plaintiff to Interventional Medical Associates, LLC ("IMA"), for an evaluation regarding her hip pain.

Plaintiff presented to IMA on August 6, 2012, reporting aching, throbbing pain in her knees, hips, ankles, joints, low back, and arms. (R. 633–44; 770–84.) Although the pain was usually present, without relation

to the time of day, Plaintiff said she did have short periods without pain.

The pain was typically accompanied by muscle tension, swelling, nausea,

fatigue, dizziness, anxiety, irritability, and depression. Her pain was

increased by cold, standing/walking, weather, driving, and exercise. She

did, however, read and walk and play with her dogs. She walked her dogs

daily, if possible, and tried to walk around the block. Her pain was

decreased by medication, alcohol, heat, and cold. Plaintiff denied frequent

headaches but reported having headaches more than once or twice a

week.

Plaintiff said her prior surgery and trigger point injections were very

helpful for relief. Exercise, over the counter medication, prescription

medication, and muscle relaxers were somewhat helpful. Chiropractic,

massage, and psychology were little help, if any. Physical therapy was of

no benefit. She had not tried electrical stimulation, nerve blocks, or

epidural injections.

On physical examination Plaintiff was 5 feet, 8 inches tall and

weighed 350 pounds, placing her in the morbidly obese category. Plaintiff

had limited cervical and lumbar range of motion and cervical muscle

tenderness on palpation. Upper trap, splenius capitis, splenius cervicis,

lower trap, and middle trap trigger points were present. Plaintiff demonstrated a full range of motion in her hips, knees, and ankles. She had tender gluteals, however, and pain on palpation of the medial and lateral joint line without effusion. Plaintiff's gait was normal and she was able to tandem walk. Motor strength was normal bilaterally in her grip, biceps, triceps, wrists, shoulders, hips, knees, and ankles. Straight leg raise was negative for radicular or lumbar pain. Examination revealed no pain behaviors exhibited and Plaintiff was alert, oriented, and demonstrated stable affect.

Prathima Reddy, M.D., diagnosed Plaintiff with the following: (1) pain in joint, pelvic, and hip region; (2) possible osteoarthritis in the knee; (3) fibromyalgia; (4) generalized polyarthralgias; (5) muscle spasm; (6) myofascial pain; (7) low back pain; and (8) chronic pain syndrome. Dr. Reddy instructed Plaintiff to continue savella and neurontin for fibromyalgia, lortab for pain, and stretch daily to address her hip pain. Dr. Reddy gave Plaintiff corticosteroid injections in both knees, and prescribed an electric bed to assist with spinal and joint pain and mobility issues. He also recommended that Plaintiff diet to promote weight loss, try aquatic-based exercise, and referred Plaintiff for knee x-rays.

Knee x-rays the following day revealed mild to mild diffuse osteoarthritis of the right knee joint, particularly involving the medial compartment of the femoral tibial joint, and mild diffuse osteoarthritis in the left knee. (R. 671–72; 942–43.)

Plaintiff returned to IMA on September 6, 2012, with complaints of continued pain in her knees and hips. (R. 657–59; 785–87.) Plaintiff weighed 365 pounds. Dr. Reddy gave Plaintiff a corticosteroid injection in the bilateral hip trochanteric bursa and prescribed tramadol for pain. He again recommended a daily stretching program, aquatic-based physical therapy, and diet to promote weight loss. He also recommended viscosupplementation for the knee pain and stiffness.

Plaintiff next returned to IMA on October 17, 2012, with complaints of nagging pain in her knees. (R. 651–53; 792–97.) Bilateral hip x-rays showed mild hip osteoarthritis. Plaintiff reported that the trochanteric bursal injection had improved her hip bursitis symptoms. He also gave Plaintiff a hyalgan injection in her knees. Dr. Reddy again recommended daily stretching and aquatic-based exercise. He also spent over thirty minutes discussing diet to promote weight loss with low glycemic foods.

On October 24, 2012, Plaintiff presented to IMA reporting pain in her

knees, right arm, and lower pain. (R. 798–800.) Several days later, on October 31, 2012, Plaintiff returned to IMA requesting refills for tramadol, lortab, and meloxicam, and reporting pain in her knees, hips, and abdomen. (R. 801–03.)

At her next appointment at IMA on December 26, 2012, Plaintiff complained of throbbing pain in her whole body, rated at a five out of ten. (R. 678–80, 692–94; 805–07.) She also reported negative side effects from codeine and lactose, including lightheadedness, dizziness, nausea, hot flashes, and constipation. Plaintiff weighed 376 pounds and had stage I hypertension with blood pressure measured at 143/79.

Plaintiff presented to Diana M. Benton, Psy.D., for a consultative psychological examination on January 4, 2013. (R. 686–90.) Plaintiff reported having muscle aches and pains, arthritis, shoulder pain, decreased upper arm strength, back pain, and restless leg syndrome. She claimed to have migraine headaches about once a week or every other week. Plaintiff also reported

> depressed mood, difficulty falling asleep and staying asleep, variable appetite . . . diminished interest in activities, frequent thoughts about death, suicidal ideation ("at least once a week[]"), "zero" energy level, diminished ability to concentrate, feelings of worthlessness, excessive worry about a number of situations, feeling on edge, muscle tension, irritability, and

panic attacks cued by worry, travel[]ing, or doing new things.

(R. 687.) Plaintiff said she took psychotropic medication since 1992, which

currently included Prozac and Xanax.

Examination revealed good eye contact, pain behaviors including

intermittently rearranging her position, spontaneous speech at a normal

rate and tone, ability to engage appropriately in conversation, and no

evidence of expressive or receptive difficulties with speech. Her thought

process was logical and goal oriented. There was no evidence of delusions

or abnormal thought content. Plaintiff demonstrated broad affect, and

laughed often and appropriately. She was well oriented to person, place,

and time. Immediate memory and remote memory were intact. She

demonstrated adequate knowledge of information and calculation. Her

abstract thinking was intact and judgment and insight were grossly normal.

Dr. Benton diagnosed Plaintiff with major depressive disorder and

anxiety disorder. Dr. Benton opined that Plaintiff "appears unable to

maintain a 40-hour work week in the accounting field due to limitations in

her capacity for sustained concentration."

Plaintiff returned to IMA on February 20, 2013, reporting aching pain

in all her joints, rated a three out of ten. (R. 681–83, 695–97; 809–11.) Dr.

Reddy gave Plaintiff a celestone injection in both elbows and recommended forearm splints to address lateral epicondylitis. He also referred Plaintiff for a rheumatology consultation to be evaluated for diffuse polyarthralgias.

On April 30, 2013, Plaintiff complained of constant aching in her hips, legs, and arms, rated at a five out of ten. (R. 814–16.) She also reported having more swelling. Her labs were negative for rheumatic inflammatory arthritis.

Plaintiff returned to IMA on July 3, 2013, reporting constant pain in her knees, lower back, and elbows, rated as a four out of ten. (R. 822–24.) She weighed 370 pounds. Dr. Reddy noted recent elbow lateral epicondylitis, bilateral left greater than right. He knee pain, however, was improving with hyalgan and pharmalogic management was helping to allow for activities of daily living.

On July 17, 2013, Plaintiff complained of aching pain in her knees. (R. 828–30.) Dr. Reddy recommended a trial of naprelan for knee pain and voltaren gel as a topical analgesic.

At her September 18, 2013 follow-up, Plaintiff complained of aching, burning, stabbing pain in her knees, hips, elbows, shoulder, and hands. (R.

837–39.) Dr. Reddy concluded that Plaintiff had new onset progressive carpal tunnel syndrom symptoms and carpometacarpal ("CMC") joint pain. He recommended a thumb spica splint to address the CMC joint pain, an electrodiagnostic study to address the carpal tunnel syndrome symptoms, and an x-ray of Plaintiff's cervical spine.

On November 13, 2013, Plaintiff returned to IMA with complaints of aching, tingling pain in both knees, hips, lower back, and both wrists and hands, rated at a five out of ten. (R. 763–69.) She also had headaches, but no migraines. Plaintiff denied side effects with her current medications. Dr. Reddy noted that nerve conduction velocities on Plaintiff's upper extremities, showed mild to moderate carpal tunnel syndrome without cervical radiculopathy. Dr. Reddy therefore gave Plaintiff wrist splints and a carpal tunnel stretching program. He noted that Plaintiff's knee pain was improving with hyalgan and that current pharmalogic management was helping to allow for activities of daily living. Dr. Reddy also gave Plaintiff another injection into her knees.

An ex-ray of Plaintiff's cervical spine on November 15, 2013, revealed status post anterior fusion from C5 through C6 and degenerative change at the C4–C5 space. (R. 941.)

Plaintiff returned to IMA on March 5, 2014, reporting aching pain in her legs, hips, lower back, shoulders, and arms. (R. 751–56.) Dr. Reddy referred Plaintiff to physical therapy.

X-rays of Plaintiff's left foot on April 25, 2014, revealed moderate mid-foot osteoarthritic disease and plantar heel spurs. (R. 940.)

Plaintiff underwent videonystagmography ("VNG") testing on April 28, 2014. (R. 856–57; 927–29.) Positional testing revealed positional nystagmus in supine with head position to the left.

At her next visit to IMA on April 30, 2014, Plaintiff complained of generalized sharp, aching, throbbing, burning, tingling pain, rated as a three out of ten. (R. 744–50.) Plaintiff weighed 318 pounds. Dr. Reddy prescribed Plaintiff a TENS unit.

Plaintiff then returned for a follow-up at AFP on May 12, 2014. (R. 924–26.) Physical examination was normal. Her major joints and spine were aligned symmetrically. There were no deformities or misalignment of bones. There were no signs of muscle atrophy, swelling, effusions, temperature changes, tenderness, or crepitus. Range of motion testing revealed no restriction or instability related to ligamenous laxity. Muscle strength testing was 5/5 in all major muscle groups. Special testing of the

joints for range of motion, nerve compression, and joint contracture was within normal limits. Based on the VNG testing, Dr. Branin assessed Plaintiff with vertigo and referred her to physical therapy for balance rehabilitation.

Pursuant to Dr. Reddy and Dr. Branin's physical therapy referrals, Plaintiff attended twenty physical therapy visits at Lake Area Physical Therapy for cervical, thoracis, and lumbar pain. (R. 874–920) By June 13, 2014, Plaintiff reported that her neck pain had improved with physical therapy. Plaintiff then transferred to Fit for Life Physical Therapy, where she treated for seven visits for vertigo and cervical pain. (R. 944–85.) By August 15, 2014, although Plaintiff continued to experience motion sensitivity, she nonetheless had decreased frequency of dizziness and increased tolerance to exercises. Her balance and gait had also improved. Plaintiff had poorly complied, however, with her home exercise program and she was discharged after not returning for further visits.

On August 24, 2014, Plaintiff returned to IMA with pain all over, rated as a six out of then. (R. 718–30.) She weighed 320 pounds. Plaintiff reported that her pain had worsened after six weeks of physical therapy and activity modification. Thus, Dr. Reddy gave Plaintiff trigger point

injections to address her cervicalbrachial myofascial pain.

Plaintiff continued to complain of pain everywhere on September 26, 2014, rating her pain as a five and one half out of ten. (R. 712–17.) She reported, however, that the cervical trigger point injections were effective. Dr. Reddy noted that her cervicalbrachial pain was likely due to dystonia and myofascial symptoms restricting her range of motion. Dr. Reddy recommended that Plaintiff try botox for chemodenervation.

Plaintiff returned to IMA on October 24, 2014 for a botox injection. (R. 706–11.) She reported continued pain all over, rated as a five and one half out of ten. Her weight had increased to 360 pounds. She concluded that the trigger point injections only provided temporary relief. Dr. Reddy gave Plaintiff botox injections in her upper, middle, and lower traps, thoracic longismus, thoracic illiopsoas, cervical paravertebrals, splenius capitis, splenius cervicis, rhomboids, levator scapaulae, and occipitals.

On November 3, 2014, Plaintiff returned to AFP with complaints of insomnia and anxiety. (R. 921–23.) Physical examination was normal, other than Plaintiff's representations that she had pain all over. Dr. Branin referred Plaintiff to Sleep Solutions of North Florida for a sleep medicine consultation.

Plaintiff next presented to IMA on November 21, 2014, with complaints of pain in the cervical area, head, arms, and both knees. (R. 700–05.) The botox injections were beneficial, however, and Dr. Reddy prescribed Plaintiff elavil and opana.

Plaintiff returned to IMA on December 22, 2014, for more botox injections. (R. 1033–38) She reported pain in her lower back, neck, shoulders, hips, and knees, rated as a seven out of ten.

Between February 19, 2015, and April 24, 2015, Plaintiff returned to IMA for six more visits. (R. 999–1032.) She continued to complain of pain throughout her entire body, rated ranging from a five to nine out of ten. Her weight fluctuated between 360 and 380 pounds. Dr. Reddy gave Plaintiff hyalgan injections in her knees at each appointment and discussed weight management. He also instructed Plaintiff to continue her home physical therapy program.

## B.  Hearing Testimony

### 1.  *First Hearing*

Plaintiff was 50 years old at the first hearing on January 13, 2015. (R. 41.) She left her full-time job on July 5, 2007, because she could no longer work a full-time schedule. (R. 44.) After leaving her full-time job she started

her own practice and worked part-time as a tax return preparer. (R. 41,
43.) Her practice grew between the time she started it in 2007 and the
hearing. (R. 45.) Plaintiff remained employed part-time as a bookkeeper
with several companies. (R. 45–46.) The amount of work that Plaintiff could
complete depended upon how she felt on a particular day. (R. 53.) Some
days she could not get out of bed and, therefore, could not work at all. (*Id.*)
Plaintiff spent, on average, three to four days a week in bed. (R. 57.) Other
days she could work some, but because her hips, knees, or lower back
hurt she could only sit in front of the computer for an hour or two. (R.
53–54.) Plaintiff took a base amount of pain medication and occasionally
had to take larger loses when her pain was worse. (*Id.*) Sometimes the
varying amounts of pain medications made it impossible to read because
her vision was blurry, double, or different colored. (R. 54.) Plaintiff also had
trouble concentrating when she did tax returns. (R. 58.)

Plaintiff lived alone and ate prepared meals. (R. 51.) She paid a
house cleaner to clean her house and a friend to do her laundry and stay
with her on the weekends. (*Id.*) Plaintiff had a car but had not been able to
drive since 2012. (R. 47.) She paid her friend to drive her when she
needed to go to clients' offices, doctor's appointments, the pharmacy, and

other places. (*Id.*) Plaintiff's friend also helped her two or three days a week with her business by reading documents to her and entering data into the computer when Plaintiff could not do it herself. (R. 56.)

Plaintiff primarily treated with Interventional Medical Associates instead of specialists because she did not have health insurance from 2007 through 2014 and could not afford specialists. (R. 52.) She was able to get health insurance in 2014, however, under the Affordable Care Act. (*Id.*) Plaintiff wore braces on her hands for carpal tunnel syndrome and pain in her arms and hands. (R. 48.) She put the braces on in the morning and wore them whenever she worked. (R. 50.) No one ever recommended that she use knee braces for the osteoarthritis in her knees. (*Id.*)

Plaintiff tried Dr. Branin's weight loss program but could not reduce her weight because she did not burn many calories walking from the bed to the bathroom. (R. 55.) Although her doctors recommended aquatic-based physical therapy, the physical therapy location she worked with did not offer the aquatic-based therapy. (*Id.*) She did stretches for her neck and dieted as well as possible. (R. 56.)

Following Plaintiff's testimony, Ms. Hayes testified as a vocational expert in this case. (R. 58.) Plaintiff previously worked as a tax preparer, a

sedentary and semiskilled job with an SVP of 4, and as a bookkeeper, a

sedentary and skilled job with an SVP of 6. (R. 59.)

> The ALJ posed the following hypothetical claimant to Ms. Hayes:

> [S]he could occasionally lift and carry up to ten pounds, but
> frequently would be less than that; she could stand and walk
> only two hours; she could sit for six hours; she would be
> unlimited in her ability to push and pull except for the weight
> restriction that I've already given; she can handle ramps and
> stairs occasionally; ladders, ropes and scaffolds never;
> balancing occasionally; stooping, kneeling, crouching, crawling
> all occasionally; there would be no other restrictions, with those
> restrictions, would she be able to do any of the two jobs that
> she mentioned?

(R. 60.) Ms. Hayes testified that the claimant would be able to do those

jobs and that those jobs do not require frequently lifting more than 10

pounds. (R. 61.)

Plaintiff's counsel then asked Ms. Hayes whether that claimant could

do either of those two jobs if she would be off task for one-third of the

workday due to problems concentrating. (R. 61.) Ms. Hayes testified that

the claimant could not work any full-time employment if she was off task for

one-third of the day. (*Id.*)

### 2. *Second Hearing*

At the second hearing on April 28, 2015, Plaintiff was 5'8" tall and

weighed approximately 380 pounds. (R. 68–69.) Plaintiff still had five

companies for which she did bookkeeping. (R. 100, 106–07.) Some of her

larger ones left but she was able to pick up some smaller companies

through word-of-mouth, wining and dining, and keeping her clients happy.

(R. 100.) She also had other individual tax clients that she saw once a year

to do their taxes. (R. 106.) She took clients out to dinner when she could to

talk to them about their businesses, but had not been able to do as much

of that lately. (R. 100.) If she could not take them out she instead had them

over to her house and they ordered in for meals. (*Id.*) Plaintiff had,

however, taken a client out for dinner the week before. (R. 105.) Prior to

that occasion, the most recent time she took a client out was in December

or January. (*Id.*)

Plaintiff spent approximately two or three hours a day working,

depending on how she felt. (R. 101.) She could not take her pain

medications and work because the medications made her feel foggy. (R.

102.)

Plaintiff was currently receiving botox injections for neck pain and

into her scalp for migraines. (R. 103.) When Plaintiff went to her most

recent doctor's appointment she reported dizziness, headaches, and

sweats, but denied migraines because the head pain did not hit until two or

three days after her appointment. (R. 104.)

Dr. Michael Cremerius, a licensed clinical psychologist, testified as a mental health expert at the second hearing. (R. 65.) Dr. Cremerius stated that the evidence for mental impairment is limited primarily to a psychological clinical evaluation done on January 4, 2013, which includes diagnoses of mild depression and anxiety, and a mental status evaluation where Plaintiff complained of insomnia and anxiety. (R. 72.) Dr. Cremerius explained that although a number of progress notes from IMA note that Plaintiff appeared depressed or anxious, there was no psychological diagnosis or psychological issue on the problem list. (*Id.*) He further opined that Plaintiff's actual diagnosis is depressive disorder and anxiety, 12.04 and 12.06. (*Id.*) Dr. Cremerius testified, however, that Plaintiff had no mental impairments that met or equaled a listing. (R. 71.)

Dr. Cremerius opined that Plaintiff has mild limitations in social functioning, concentration, persistence and pace, but no periods of decompensation. (R. 73.) Plaintiff's psychological impairments were mild, not severe, and did not evidence that Plaintiff was unable to work a forty-hour week. (R. 75.)

Dr. John Kwock also testified at the second hearing as an orthopedic

specialist. (R. 78.) Dr. Kwock explained that Plaintiff had three areas of

musculoskeletal issues: neck pain, left knee pain, and left foot pain. (R.

79.) After reviewing all three issue areas, Dr. Kwock opined that Plaintiff

did not have any significant or severe impairments and that the three areas

of musculoskeletal problems did not meet or equal any listings. (R. 80–81.)

Dr. Kwock further opined, however, that Plaintiff was morbidly obese,

which was a limitation that affected the musculoskeletal area. (R. 81.)

There was no evidence that Plaintiff had a lumbar or thoracic issue. (R.

86–87.)

Dr. Kwock did not review the record looking for specific fibromyalgia

diagnosis items. (R. 83.) Nevertheless, he did not recall seeing anything in

the record regarding Plaintiff's doctors saying that they used approximately

nine pounds of pressure when applying force. (R. 84.) There was one

cervical spine MRI performed in 2007, a cervical spine x-ray from

November 2013, x-rays of the right and left knee from August 2012, and an

x-ray of the left foot from April 2014. (*Id.*) There were no EMG reports

evidencing nerve conduction studies. (R. 85.) Although one record noted

the results of an EMG and nerve conduction test on Plaintiff's upper

extremities, Dr. Kwock did not accept that as evidence of nerve conduction

studies because the notation was historical. (*Id.*)

Dr. Kwock opined that in the absence of Plaintiff's obesity, there were no significant or severe impairments. (R. 87.) Plaintiff's obesity did, however, interfere with neck function, knee function, and gait walk function. (*Id.*) Specifically, Plaintiff could occasionally carry thirty pounds and frequently carry twenty-five pounds. (R. 88–89.) Plaintiff could sit for six hours, stand for one hour at a time, and stand for a total of four hours in an eight-hour workday. (R. 89.) Plaintiff could walk for thirty minutes in an eight-hour workday. (R. 89–90.) Plaintiff could not climb ropes, ladder, scaffolds, stairs, or ramps, and could not squat, kneel, stoop, crawl, or bend to tie her shoe. (R. 90.) She could, however, bend to go from a standing position to sitting. (*Id.*) Plaintiff had no limitations regarding her upper extremities or hands. (*Id.*) She should avoid heights and dangerous machines. (R. 90–91.)

Dr. Kwock did not think Plaintiff needed a hospital bed or a medical assistant. (R. 91.) None of Plaintiff's medications would affect her musculoskeletal system's ability to function. (R. 91–92.) Plaintiff should be able to do a sedentary job. (R. 93–94.)

Finally, Jenny Kramer also testified as a vocational expert at the

second hearing. (R. 108.) Ms. Kramer agreed that Plaintiff's prior jobs were

tax preparer and bookkeeper, both sedentary jobs. (R. 109.) The ALJ

posed the following hypothetical to Ms. Kramer:

> [The claimant] could lift and carry 30 pounds occasionally, 25
> pounds frequently; she could sit for six hours, she could stand
> total in an eight-hour period of four hours at one hour at a time;
> she could walk only for 30 minutes. She should not stoop,
> crawl, bend over to tie her shoe, although the doctor indicated
> she could bend to sit and stand; she should not kneel, squat;
> she should not push or pull; there were no restriction placed on
> her upper extremities; no restriction as to seeing, hearing and
> talking; he also eliminated ramps and stairs, ladders and
> scaffolds, uneven ground, heavy equipment, heights and
> dangerous machines.

(R. 109–10.) Ms. Kramer opined that the hypothetical claimant could work

as a tax preparer or bookkeeper. (R. 110.) If, however, the hypothetical

claimant would be off-task for an hour within every two to three hours

because she needed to rest, there would be no suitable jobs for the

claimant. (*Id.*)

## C.  The ALJ's Findings

The ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through December 31, 2016. (R.

17.) She further determined that Plaintiff had not engaged in substantial

gainful activity since July 5, 2007. (*Id.*) The ALJ found that Plaintiff had the

following severe impairments: status post ACDF fusion, knee osteoarthritis, and obesity. (R. 18.) At step three of the sequential evaluation, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (R. 19.)

With respect to Plaintiff's residual functional capacity ("RFC") at step four of the sequential evaluation, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with additional limitations. (R. 20.) The ALJ then found Plaintiff was capable of performing her past relevant work as a tax preparer and bookkeeper. (R. 25.) Accordingly, the ALJ concluded that Plaintiff had not been under a disability from July 5, 2007, through the date of the ALJ's decision. (*Id.*)

## IV.  DISCUSSION

Plaintiff raises two issue on appeal: (1) Whether the ALJ erred in considering Plaintiff's subjective complaints; and (2) Whether the ALJ erred when considering Plaintiff's obesity in assessing Plaintiff's RFC.[4] (ECF No.

---

[4] In arguing that the ALJ erred, Plaintiff makes reference to her morbid obesity, pain, and other impairments, and says she cannot be present enough to meet the productivity expectations of an employer, and then spends two pages quoting SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002), which is the Social Security Administration's Policy Interpretation Ruling issued to provide guidance on Social Security Act policy concerning the evaluation of obesity in disability claims filed under Titles II and XVI. (ECF No. 21 at 46–49.) Plaintiff then merely argues "[i]n this matter the RFC, when

21.)

## A.    Substantial evidence supports the ALJ's credibility finding.

At step four the ALJ must assess the claimant's RFC and her ability to return to past relevant work. § 404.1520(a)(4)(iv). The ALJ must take the claimant's medical evidence and other evidence into consideration in his RFC analysis. § 404.1520(e). If a claimant cannot return to her past relevant work, the ALJ moves onto step five to determine if the claimant can adjust to other work. *Id.*; *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004).

Under the Eleventh Circuit's pain standard, a claimant may establish her disability through his own testimony of pain or other subjective symptoms. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005); *Foote v. Chater*, 67 F.3d 1553, 1560–61 (11th Cir. 1995). The ALJ must consider a claimant's testimony of pain and other subjective symptoms where the claimant meets the Eleventh Circuit's three-part "pain standard." *See*

---

weighed against [P]laintiff Black's impairments, is not supported by substantial evidence." (*Id.* at 49.) Typically, such a conclusory and unsupported argument would be deemed waived. *See N.L.R.B. v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) (noting issues "raised in a perfunctory manner, without supporting arguments and citation to authorities are generally deemed to be waived"); *Outlaw v. Barnhart*, 197 F. App'x 825, 828 n.3 (finding plaintiff waived an issue for failing to elaborate on the claim or provide citation to authority to support the claim). Nevertheless, in an abundance of caution the Court will address Plaintiff's claim, which appears to be that the ALJ erred in considering Plaintiff's obesity when assessing Plaintiff's RFC.

*Foote*, 67 F.3d at 1560. Under that test, evidence of an underlying medical condition must exist. *Id.* If that threshold is met, then there must be either objective medical evidence that confirms the severity of the alleged pain or symptoms arising from the underlying medical condition, or evidence that the objectively-determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain or symptoms. *Id.* A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is sufficient to support a finding of disability. *Id.* at 1561.

If the record shows that the claimant has a medically-determinable impairment that could reasonably be expected to produce her symptoms, the ALJ must evaluate the intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). In doing so, the ALJ considers all of the record, including the objective medical evidence, the claimant's history, and statements of the claimant and her doctors. §§ 404.1529(c)(1)–(2). The ALJ may consider other factors, such as: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type,

dosage, effectiveness, and side effects of the claimant's medication; (5) any treatment other than medication; (6) any measures the claimant used to relieve her pain or symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to her pain or symptoms. § 404.1529(c)(3). The ALJ then will examine the claimant's statements regarding her symptoms in relation to all other evidence, and consider whether there are any inconsistencies or conflicts between those statements and the record. § 404.1529(c)(4).

If the ALJ decides not to credit the claimant's testimony as to her subjective symptoms, the ALJ must articulate explicit and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote*, 67 F.3d at 1561–62. While the ALJ does not have to cite particular phrases or formulations, broad findings that a claimant was incredible and could work are, alone, insufficient for the Court to conclude that the ALJ considered the claimant's medical condition as a whole. *Id*. at 1562. The ALJ's articulated reasons must also be supported by substantial evidence. *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991). The Court will not disturb a properly articulated credibility finding that is supported by substantial evidence. *Foote*, 67 F.3d at 1562.

The failure to articulate reasons for discrediting a claimant's subjective testimony, however, requires that the testimony be accepted as true and becomes grounds for remand where credibility is critical to the outcome of the case. *Id.*

The ALJ is not required to recite the pain standard, but she must make findings that indicate the standard was applied. *Cooper v. Comm'r of Soc. Sec.*, 521 F. App'x 803, 807 (11th Cir. 2013). Whether objective medical impairments could reasonably give rise to the alleged pain is a question of fact for the Commissioner and the district court's review is limited to ensuring substantial evidence supports the Commissioner's finding. *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986).

In determining Plaintiff's RFC at step four, the ALJ found that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 21.)

In finding Plaintiff's statements not entirely credible, the ALJ properly considered Plaintiff's statements under the Eleventh Circuit's pain

standard. The ALJ considered Plaintiff's medically determinable

impairments, including status post ACDF fusion, knee osteoarthritis,

obesity, degenerative disc disease, anxiety, and depression, but found

Plaintiff's statements concerning the intensity, persistence, and limiting

effects of the symptoms not to be entirely credible. Contrary to Plaintiff's

assertion, the ALJ then elaborated and gave adequate reasons as to why

she found Plaintiff's statements not to be entirely credible.

For starters, the ALJ discussed Dr. Kwock's expert opinion, giving Dr.

Kwock's opinion great weight. *See* § 404.1529(c)(1) (explaining that in

evaluating the intensity and persistence of a claimant's symptoms, the

Commissioner considers all of the available evidence, including the

"medical opinions of your treating source and other medical opinions"). Dr.

Kwock noted that Plaintiff's neck surgery in 2007 was successful and that

while knee x-rays showed mild osteoarthritis, there was no significant

impairment in either knee. (R. 21.) Plaintiff did not meet the medical

requirements for a fibromyalgia diagnosis and she was never referred to an

orthopedist or neurologist. (R. 21, 24.)[5] Dr. Kwock noted, however, that

Plaintiff's morbid obesity would affect the musculoskeletal system and

---

[5] Plaintiff does not challenge the ALJ's findings specifically pertaining to
fibromyalgia. She has therefore abandoned any arguments relating to such.

prevent her from doing strenuous work activity. (*Id.*)

The ALJ also discussed how Plaintiff has not required extended inpatient hospitalization for a physical problem. (R. 24.) The record does not evidence any medication side effects that would affect Plaintiff's ability to work. (*Id.*) Although the record evidences discontinuation of various medications due to side effects, Plaintiff repeatedly denied side effects with her current, ongoing medications. Furthermore, Plaintiff does not require an assistive device for ambulation. (*Id.*) Examinations revealed that Plaintiff walked with a stable, normal gait and could tandem walk.

The ALJ further noted that despite Plaintiff's complaints of migraines, the evidence does not reveal headaches of the frequency, severity, or duration that would preclude Plaintiff from working. (*Id.*) Plaintiff reported a history of intermittent headaches in 2007, saw a chiropractor for various problems, including but not limited to migraines, for five months, told Dr. Benton she gets headaches every other week, and reported headaches in 2013. While these statements suggest that Plaintiff may suffer from occasional headaches, the record fails to evidence persistent, frequent migraines that would prohibit her from working.

The ALJ also emphasized that none of Plaintiff's treating physicians

enumerated any physical work-related limitations. *See Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 901 (11th Cir. 2012) (quoting *Phillips*, 357 F.3d at 1240)) ("When determining a claimant's RFC, the ALJ must give the opinion of a treating physician 'substantial or considerable weight unless good cause is shown to the contrary."). Despite Plaintiff's ongoing reports of pain to Dr. Reddy and Dr. Branin, and contrary to Plaintiff's assertion that her "treating physicians not only believe[] that [she] suffers from chronic debilitating pain," (ECF No. 21 at 52–52), neither Dr. Reddy nor Dr. Branin ever provided a treating source opinion as to Plaintiff's functional limitations during the relevant time period, or otherwise suggested in their medical records that Plaintiff had functional limitations that would preclude her from working.

Furthermore, in addition to the aforementioned medical evidence, the ALJ pointed to substantial other objective medical evidence that supported her credibility finding throughout her RFC explanation. *See Dyer v. Barnhart*, 395 F.3d 1206, 12111 (11th Cir. 2005) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the

ALJ considered her medical condition as a whole."). A lack of medical

reports evidencing exertional limitations suggests that a claimant's

impairments may not be as limiting as alleged. *See Sellers v. Barnhart*,

246 F. Supp. 2d 1201, 1211 (M.D. Ala. 2002) (finding that substantial

evidence supported the ALJ's conclusion that plaintiff's impairments were

not severe because there were no reports indicating exertional limitations).

 For example, the ALJ noted that in 2007, Plaintiff's cervical spine had

no outward abnormality, her motor strength was five out of five in all motor

groups in all extremities. (R. 22.) After undergoing surgery for cervical

radiculopathy in the right arm due to disc herniation and nerve root

compression, Plaintiff was doing well six months out from surgery and

stated that although she had occasional discomfort in her neck, her

symptoms were not overly problematic and instead just an occasional

nuisance. (*Id.*) She had good range of motion in her neck. (*Id.*)

 X-rays of Plaintiff's knees in 2012 showed mild to moderate

osteoarthritis, but did not show significant impairment of either knee. (R.

21–22.) Her hip pain improved with injection and she was advised to

stretch daily to alleviate the hip pain associated with bursitis and tendonitis.

(R. 22.) Nerve conduction studies showed mild to moderate carpal tunnel

syndrome without cervical radiculopathy and Plaintiff was therefore given

wrist splints. (R. 23.) Labs were negative for rheumatic inflammatory

arthritis. (*Id.*)

Despite Plaintiff's physical impairments and history of pain, the ALJ

pointed to reasons that suggest Plaintiff's symptoms are not as limiting as

alleged. The ALJ has wide latitude in evaluating the weight of evidence,

particularly the credibility of witnesses. *Owens v. Heckler*, 748 F.2d 1511,

1514 (11th Cir. 1984). Accordingly, substantial evidence supports the

ALJ's credibility determination.

**B.     Substantial evidence supports the ALJ's finding that Plaintiff
has the RFC to perform light work with additional limitations.**

After determining that Plaintiff's statements about the limiting effects

of her symptoms and pain were not entirely credible, the ALJ determined

that Plaintiff has the RFC to perform light work with additional limitations:

> [S]he can lift/carry 30 pounds occasionally and 25 pounds
> frequently. She can sit 6 and stand one hour at a time for a
> total of 4 hours in an 8 [hour] workday. She can walk 30
> minutes at a time. The claimant cannot stoop, crawl or bend
> over to tie her shoes. She can bend to sit and stand. The
> claimant has no restrictions on her upper extremities. She can
> sit and use her arms and hands. The claimant must avoid
> dangerous heights and moving machinery. She can be
> exposed to vibrations. She can ambulate for distances. She
> cannot climb ladders, ropes, or scaffolds. She would have
> trouble mounting heaving equipment.

(R. 20.)

A claimant's RFC is the most a claimant can do, despite his limitations. 20 C.F.R. § 404.1545(a)(1). The RFC is based, not only on medical opinions, but also the ALJ's review of all relevant evidence in the record. *Id.*; 20 C.F.R. § 404.1546.

Under SSR 83-10, "light work" is defined as:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing--the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.

Additionally, SSR 83-10 defines "frequent" as:

> occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the

fingers for fine activities to the extent required in much sedentary work.

Substantial evidence supports the ALJ's determination that Plaintiff has the RFC to perform light work with additional limitations.

As an initial matter, the ALJ properly evaluated Plaintiff's obesity in assessing Plaintiff's RFC. The ALJ found that Plaintiff's severe impairments included obesity, but determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (R. 18–19.)[6] The ALJ then wrote that she considered the effects that Plaintiff's obesity has on Plaintiff's ability to perform routine movement and necessary physical activity. (R. 24.)

When evaluating obesity to assess a claimant's RFC, SSR 02-1p provides, in pertinent part,

> [a]n assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an

---

[6] Based on the portion of SSR 02-1 that Plaintiff quotes in her memorandum, she does not appear to challenge the ALJ's evaluation of Plaintiff's obesity in determining whether Plaintiff meets or medically equals the severity of one of the listed impairments.

ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea. The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone. . . . . As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations.

2002 WL 34686281 (Sept. 12, 2002).

The ALJ expressly stated that she undertook this evaluation and determined that, although Plaintiff "does have greater limitation because of her obesity, the medical evidence has not shown extreme limitation." (R. 24.) Instead, Plaintiff's "limitations resulting from her obesity would only prevent her from doing strenuous work activity as reflected in Dr. Kwock's testimony and incorporated into the RFC assessment . . . ." (*Id.*) Specifically, the ALJ restricted Plaintiff to light work with additional limitations on standing, walking, postural activities, environmental conditions, and mounting heavy equipment. (R. 20.) The ALJ's determination is supported by substantial evidence, including Dr. Kwock's opinion, the aforementioned objective medical evidence, and the lack of

any functional limitations suggested by treating physicians. *See Lewis v.*

*Comm'r of Soc. Sec.*, 487 F. App'x 481, 483 (11th Cir. 2012) (ALJ properly

considered plaintiff's obesity in accordance with SSR 02-1p where ALJ

determined plaintiff's obesity was a severe impairment but did not meet or

equal a listing and then considered plaintiff's obesity in assessing the

RFC). The ALJ's decision should therefore be affirmed.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the

decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on the 5th day of December

2017.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**